We will hear argument this morning in Case 25-95, Pung v. Isabella County. Mr. Ellison. Mr. Chief Justice, and may it please the Court, the Fifth Amendment requires just compensation be measured by the value of what's taken. The Sixth Circuit's categorical rule reducing just compensation to surplus auction proceeds in all instances was wrong. This Court has repeatedly confirmed that when the government takes property, the constitutional calculus begins with its fair market value. That is measured from the time of the take. The error here is clear. The Pung home was worth $194,400. The tax debt was roughly $2,200. Just compensation meant returning remaining equity. The lower courts erred when holding that the later auction price of just $76,000 less the debt was categorically the only just compensation owed. But this Court said it directly in Jacobs. An owner is owed just compensation, not inadequate compensation. Following Tyler, there are no windfalls to the government. This case now asks the Court to confirm the other half, that the Constitution likewise forbids confiscatory losses when being imposed upon a former owner. Federal courts should consider all relevant evidence of market value and determine whether just compensation has in fact been paid. In addition to the Fifth Amendment, the Eighth Amendment's excessive fines clause provides a backstop as well. Taking a six-figure home to punish over a small four-figure tax constitutes a fine. And was sufficiently alleged to be grossly disproportionate to get past the initial pleading stage. The judgment below should be reversed, and I welcome the Court's questions. What do you do with the fact that the English and American legal traditions seem to permit these sorts of foreclosures? So the fact that our history allows for these types of foreclosures is only one half of the equation. The other half of the equation, historically, is that protections have been built in. For example, one of many is, for example, that personality has to be taken before the real property, for example. This process that Isabella County undertook lacked that second half of that historical tradition. Yes, surplus is the ultimate outcome if, in fact, the auction resulted in a fair market value. But when it doesn't result in a fair market value, historically, courts have been allowed to challenge inequity, to set aside the foreclosure itself, or to otherwise award damages or compensation in those particular circumstances. I'm sorry. Where in your merits brief did you point to that history? I know that there have been cases that talk about the fairness of an auction, and that certain rules were set up to ensure fairness, that it had to be an open bidding system, etc. When those were set aside, there's a measure of compensation that's different than the proceeds. But I think what Justice Thomas is saying, there is a long, long history of tax foreclosures, of bankruptcy foreclosures, we've even had a case on that, where the issue is whether the proceeds from that foreclosure have to be fair market value. And we've said no. So respectfully, the last word on this has been BFP, which was done specifically in a bankruptcy context of reasonably equivalent value. Now, I've asked you a different question. Show me cases that don't involve the unfairness of an auction, where the courts have given damages greater than the auction price. We would point you to Griffin and Ballantyne on this matter, that has suggested that when a... ...suggested, give me a holding from a court in our 250-year history, where we have said that the measure of damages on a tax foreclosure is fair market value, not the auction price. There has not been that specific holding in this Court's history, but there has been the history of like parallel circumstance foreclosures, of mortgage foreclosures and other circumstances where the typical market allows... As Justice Scalia said, the auction price, you couldn't make it the fair market value because this is not a fair market value sale. An auction is a different forced sale, and so it will yield a different measure. We would point this Court to Virginia Electric, that says that any depreciation in the value of the process itself has to be a burden to the government, and it is their responsibility to suffer that loss. The time of the take is very important to establishing what the value of that property is. What if it were a completely fair process, however many weeks, months you think notice has to be out there so everybody gets to it, easy to visit them, all these things, and you still came out with a price that was below what, for example, the House would sell on the open market because maybe people don't want to go and get a tax foreclosure system or whatever. In other words, if you're satisfied with the fairness of the process and it comes out with something below what you think is fair market value, is that just too bad? The answer is that the Fifth Amendment guarantees just compensation. It doesn't guarantee the outcome of an auction. And I would point this Court to the Lawton decision that says that when a former property owner affirms the selling of the property, they're entitled to at least, and that's, I think, a very important two words, at least the surplus proceeds. This case is distinguishable because- Well, I know this case is distinguishable, but I think the Solicitor General's position is that you look to the fairness of the process. And what would satisfy you with respect to the fairness? I mean, the just compensation is not out there. If it's a period at which there's a Great Depression or whatever, it may not seem fair to you that you have to sell the house for a fraction of the value it was worth before. But what would they have to do to satisfy you that it was a fair process? In most instances, with well-developed, well-designed foreclosure systems, which we would point to, for example, many of the examples in the National Association of Realtors' amicus brief, if those systems are designed to actually get the reasonable fair market value at the time, you're going to have very few cases in which this type of discrepancy, the delta between the actual known value of the property and the auction price- Well, I guess that's what I'm trying to figure out, the known value of the property. You don't know what it is. One way to find out is have a fair sale in an open market. So what's wrong with that? I mean, I know you can object to saying, well, there wasn't enough whatever, there wasn't enough time. But what would it take for you to say that was a fair process, even if it comes out with a number that is unsatisfactory to you? What we would seek is that an auction process is simply one piece of evidence that's overall, in the overall scheme of possible evidence that competing parties could submit to the court to determine what is in fact the fair market value. In auction, in this case, for example, we say the auction price didn't result in the fair market value, and we offer contrary evidence. Courts of this country routinely and regularly figure out and decide what is a fair market value in all sorts of contexts. Mr. Ellison, I guess I thought from reading your briefs, and tell me if I'm wrong, that you had agreed that in general foreclosure sales do not produce a fair market value price. In other words, just the fact that even with a very fair auction system, just the fact that a property is being offered for sale in those circumstances means that there's going to be a depressed price. And I think that we, this Court, has recognized that in the past. And I suppose what, I think I'm looking for the same kind of answer that the Chief Justice is. If the auction is fair, and it nonetheless produces a depressed price, you know, a price that's lower than the price that you would have gotten two years earlier had there not been a foreclosure, I mean, are you contesting that as an empirical matter? Are you saying that even if it's true as an empirical matter, you're still entitled to the free market value? I think what we're taking is a more nuanced half-step from that position. Our position is that we as a property owner should be able to challenge if, in fact, the auction price reached that fair market value. Some auctions will reach fair market value as a matter of course. Some, like in this instance, did not. And we should be able to present the evidence to say that the outcome, even if it's a fair auction, did not result in a fair market value, which in turn would not translate into just compensation for what was taken. Mr. Ellison, assuming for the sake of argument that your client got notice of the foreclosure, were there not steps that your client could have taken to prevent landing in the predicament where your client found himself? If you had $200,000, $190,000 equity in this house, couldn't your client have gotten a loan using that as collateral, paid the taxes, and there never would have been a sale? In reality is that many times the foreclosure process itself does prevent practically individuals from going out and being able to dispose of that property on the terms that they themselves would do because we've crossed over into the foreclosure process. This process that we're talking about today is a bit unique in that the actual taking of the property starts before the foreclosure process, before actually taking title. Our position is that the taking of the title itself is what starts that process, and that's the value that it should be on that particular day. Could you spell out for me step-by-step what you think the county was obligated to do? So they foreclose. Step number one, they foreclose. And then what? At that point there would be what's called a forfeiture, which is a unique aspect of Michigan law. There's a forfeiture. Then there's a foreclosure where they assume and take title, complete title to the property. Okay. So they have title to the property. And then they pay you what you say is the fair market value of the property? At that point the government has two paths in Michigan. One is they can go down and another government can purchase that property for its fair market value, the actual known fair market value, or it goes to an auction process. Our position is that when it went to the auction— If it went to the government side, yes. If the government purchased it, correct. And then the county has an inventory of unoccupied houses, and it has to sell those houses on the open market? It would sell them on an auction process, yes. On an auction process? They've decided to use an auction process. They're not required to use an auction process. Well, do you think this auction process produces the fair market value? This one does not in all instances, no. Do you think an auction process generally produces the fair market value? Houses are not usually sold by auction. I think it can reach auction value. Speaking from my own anecdotal evidence of my work in Michigan, auctions can reach fair market value. If they use a fair auction process, that's it? They're okay, even if it doesn't yield fair market value? What you say is fair market value? No, and that's where I was going to just leave you. This is where the shortcoming is in the Michigan system. In most typical foreclosure systems, there is a sales confirmation or review process that's done by the court to confirm that. It's usually called a confirmation sale. For example, North Carolina is a good example of this. The former owner can go back and point out either the unfairness of the sale or the inadequacy of the price and say, don't confirm this sale because it doesn't reach fair market value in these circumstances. Okay, and then what happens? At that point, the court reviews the competing evidence that's between the various parties. The court decides what the fair market value is. That is correct. You get the fair market value. That is correct. And then the county has to try to sell the house. That's correct. And what if they try to sell it on the open market and they can't get what was estimated to be the fair market value? Then the Fifth Amendment requires that they pay the difference on this being the just compensation that's owed. And during all this time, they've got this inventory of unoccupied houses. They have to maintain them. They have to make sure they're not vandalized. They have to maintain insurance on these properties. By the government deciding to collect as a debt collection practice, deciding to use interim civil forfeiture as a basis to collect on the debt, rather than, for example, suing or going after personal property, going after bank accounts, that's the obligation that they assume in that particular circumstance. Counsel, what's your best evidence that historically the kind of procedure you're describing from North Carolina was used? Because it seems to me that historical evidence shows that you were entitled to the surplus of the proceeds from the auction. The examples are not as many as I would like them to be, but the reality is if we would look to Ballantyne and Grantham as the two types of examples to show that when a sale doesn't reach the ultimate result or a level of unfairness is included in that sales process, that there can be a challenge before the sale is, in fact, confirmed by the court. Did you argue below that the process was in any way unfair? We were precluded from that at the 12B6 stage. You mentioned to Justice Thomas that you think it's, and you kind of get at this in your reply brief, that historically the government had to go after personal property before going after real property. Did you make that argument before the Sixth Circuit? No, because the ruling of the court below, both the trial court and the Sixth Circuit, is that surplus was categorically the only measure of damages. Well, it seems to me that why would we get into that? It seems to me a pretty dangerous road to go down for us to say that those things would be constitutionally required when they were neither pressed nor passed upon below. We would advocate that simply the rule that was developed by the Sixth Circuit below that said surplus is categorically fair market value is, in fact, too narrow of a rule and that the Sixth Circuit can deal with these types of what sort of processes and procedures could be built into this to establish a fair process going forward. That seems to square with what the Solicitor General suggests on page 26 of its brief, where in disagreement with you it suggests that auctions can sometimes be fine, but you have a right to challenge the procedures. It observes that that is not the basis on which the courts below proceeded. I agree, looking at the Sixth Circuit in particular, they relied on BFP in this categorical rule and didn't get into this, and so the Solicitor General suggests we should vacate and remand to allow those arguments to proceed. I don't see how we could affirm if those arguments were not passed upon below and there might be an argument that personal property has to come first. I just want your thoughts on that. So we share some overlap with the government's position in that a reversal and remand should be appropriate in this because the narrow rule the Sixth Circuit adopted of categorical surplus proceeds always equals fair market value. One type of challenge could be a fairness challenge as to the sales process, but that's not the only challenge. Right. And I understand you think there are more challenges available. Correct. The government agrees at least a fairness or procedural challenge is available. Correct. But that wasn't considered by the Sixth Circuit. We would agree with that position, but we would take it one step further and say that fairness of the auction is not the only consideration. If you were given that kind of remand opportunity, and now I'm talking just about the fairness of the auction, so put aside whatever other thoughts you might have about things you would like to be entitled to, but just the fairness of the auction, would you have objections on that score? We would have objections on that score, but those were not developed on this record. What are those objections? For example, Michigan's system, for example, at an auction, the buyer of that process can't do an inspection of the property, can't go through the property. You have to show up, for example, with cash on hand two hours after the sale price itself. This needlessly depresses the market price because it increases risk in that market, which then depresses the price of the property itself. And that's something that has not been developed. So we would just remand and let the courts below deal with that?  And we think that both the sale process itself would be one theory that could be challenged. That's not our only theory that we would challenge. We think inadequacy of price combined with many of these unfair factors could then result in a – Would you also make the argument about the personal property having to come first? I mean, the other part of this would be the challenge would be that Michigan's system – Michigan's very unique because it only took surplus proceeds responsibility. It didn't take the back-end responsibility, the Valentine-style responsibilities of being able to challenge within the system itself, which is why we're in federal court with 1983 as a supplemental-type action to fix that shortcoming. Is that a yes? Is that a yes, that you would, if I might just finish, that you would, before taking the property, one process that they need to consider is taking personal property first? The answer is yes. Can I just follow up on that? Because I'm wondering whether or not that kind of concern doesn't ring more in like a due process claim rather than just compensation because to the extent you're arguing about or your claim is that they needed to do other steps before they took the property, I didn't understand the takings clause to be concerned about pre-takings deprivation, that the takings clause was just about just compensation. And so wouldn't you be needing to bring a kind of a due process-type claim if you're complaining about the personal property aspect of this? We would acknowledge that due process comes awful close in the just compensation world, but the question that's being challenged here is does the result of this foreclosure process result in just compensation? Yes, no, I know that, but I'm saying to the extent in the context of just compensation we're now thinking just for the moment about what happened before this taking, I wonder whether just compensation is the right analytical framework to evaluate that. It doesn't seem to me to be, and I know you're not making that argument here, but I'm just sort of responding to the thought that if there is some sort of problem with what the government was supposed to do before the taking, we should not be thinking of that as a just compensation issue. It is possible that a just due process aspect of this can- All right, on the just compensation issue, I guess the thing that I'm really, really struggling with is the notion that just compensation is necessarily always tied to the fair market value, and you've said it many times, but I'm wondering if it doesn't also have to account for the circumstances under which this sale is taking place. So we have your client, Mr. Pong, who had this house, but he also didn't pay his taxes, and kind of going with what Justice Alito was saying, piggybacking on it, I suppose there are things he could have done to cover his tax bill. So the government is coming in at the beginning to foreclose on this house for the payment of his debt. Given that circumstance, I guess I don't understand why your argument doesn't kind of turn the government into Mr. Pong's real estate agent with some sort of fiduciary duty to maximize the value of this asset. The government's only real interest in this is covering its tax liability, and if Mr. Pong wanted to get the maximum value of the house to cover that debt, he could have sold it himself and gotten the fair market value on the day that you say, the government came, I think, to foreclose on it. So having chosen not to do that, forcing the government to sell his house, I guess I'm worried about suggesting that he can come back after the fact and say, no, you didn't do enough to get the maximum price. All they have to do is just give him the excess of what they sell it for, and that should be the end of it, I think, conceptually. So tell me why I'm wrong about that. So I'm going to take a half step back and then a full step forward to say that what the Fifth Amendment requires to reach just compensation, if you're going to trigger this process, because there's no obligation to do a tax foreclosure. This is voluntary on the part of the government itself. But only insofar as they're responding to his delinquency. So his delinquency is the beginning. You haven't really focused on that, but the first thing is Mr. Pong, pay your taxes. And when he doesn't, the government has several options to try to figure out what to do. One of them is, okay, you have this other property, whether it's real property or personal property, we are going to foreclose on it. If Mr. Pong says, please don't because my house is worth $100,000 and if you put it into a tax sale, it's only going to get $70,000, he can sell the house and get the $100,000 and pay the tax bill. The government doesn't care about that. Why didn't he do that? Well, first of all, he didn't do that because he didn't owe the tax, which has been one of the underlying aspects of this. Well, we have to assume that for the purpose of this, right? I would agree. But the point I guess I would come back to at the start of your question on this would be is that in a tax foreclosure takings context, the obligation of the government under Cherokee Nation is to have reasonable, certain, and adequate provisions to reach just compensation. Right. And the just compensation is the difference between what the government was forced to sell his house at on the tax sale and what he owed in taxes. So they gave it back to him, right? They sold it for $70,000 or whatever it was, gave it back to him, and I would think they're done. You're saying they had an obligation to not sell it for the $70,000 or to reach into the public fist and pay the difference between the $70,000 and what it would have sold in a fair market scenario, and I don't understand where that comes from. Where it comes from is the obligation that if you're taking property, which is here the property interest is not the auction proceeds. The property interest here is the value of the equity that was taken. One last time. They're not taking property like a government who wants to build a railroad. You know, the government wants to have a sidewalk or a park. They're taking property because he didn't pay his taxes. And so, to me, that context makes the just compensation analysis different. Respectfully, I would say that the takings law doesn't turn on moral fault. And the reality is the balance. I thought we were doing just compensation. There is equity in this. But the balance of the fairness was decided at the adoption of the Fifth Amendment. The tradeoff between the government and the citizen was already weighed and the obligation was put on the government by putting just compensation obligations on the government itself. Thank you, Counsel. Justice Thomas, anything further? Justice Alito? Let me come back to the point that Justice Jackson was just making. Typically, if a property owner doesn't pay real estate taxes, the jurisdiction will send a notice and say you didn't pay your taxes, and maybe they'll send several. And they'll warn, you know, if you don't pay your taxes, we can foreclose on your property and sell it at a tax sale. Now, before any of that occurs, I still don't understand why the taxpayer cannot, a taxpayer who's in a situation like your client, and again assuming there was proper notice here, take steps to prevent a tax sale from taking place. If you've got $190,000 of equity in the house and you owe $2,000 in taxes, can you not get a loan using your equity as collateral?  It is difficult to do that. There is off-ramps that individuals can try to do. In fact, Mr. Punk tried to do that in this case in numerous parts with interactions with the tribunal, with the tax tribunal, and things of that nature. To answer your question, there are steps they can take, but if they cross that Rubicon, if the government takes that property. Yeah, but before the government takes the property, there are steps that can be taken. But if those steps aren't taken for whatever reason. Well, if the taxpayer doesn't take them for whatever reason the taxpayer has, then perhaps one shouldn't feel so sorry for the taxpayer when the tax sale occurs. There are a lot of outfits that will buy houses, slate unseen for cash. I guess I would add another option. I don't think that's another option because, you know, if Mr. Punk didn't want to leave his home, the ability, this is the home that he wanted his nephew's son and his family to be able to have and retain. The idea that we vacate from the family home because of the tax that's being challenged in this aspect strikes me as being kind of counterbalanced to the equity that we shouldn't be forced to sell something that we shouldn't necessarily want. And that's another argument about whether monetary compensation is always sufficient to constitute just compensation when there's an emotional attachment to a house, which is a serious thing. But that's not the issue here. Well, but the issue is here ultimately is that there is a piece of property that has been uncontested by the government to be worth approximately $200,000. Once the government has decided it's going to take more property than what the actual value of the debt actually is, that's what triggers the takings obligation. And if it's not a takings obligation, of course, we've also argued it's an investment. What sorts of personal property do you think the government has to go after first before it goes after the house? Well, in this case with a tax debt of about $2,200, it could have been the Peloton bike that was in the house. You think a Peloton bike today is worth $2,000? Well, if you go on Facebook Marketplace and you try to sell a Peloton bike today for $2,000, I don't think you're going to be very successful. How are they going to know that he has a Peloton bike? Traditionally, joking aside, traditionally there are a lot of different options. There are bank accounts, there's personal property, the vehicle. There are vehicles and bank accounts. Maybe they can find out about that. Other than personal property, how are they going to know what he has? Don't they have a right to go in the house and inspect everything and see whether there's a valuable, gigantic TV that might be sold? When the government is acting in a debt collector capacity, and when I'm not paid a debt, that's the obligation I have when I'm collecting a debt from someone that hasn't paid, the government is no different. If we start to set out all sorts of rules for these tax sales to make them fair, how many years and how many cases do you think it's going to take to flesh out all of these details without any historical support for the procedures that you seem to think are required? We think that the government has excellent models that are already in place that they could utilize. For example, Michigan's mortgage foreclosure process is well-established over 100 years. It's already a known market. It's already a known process. They could adopt that on its own and would have the back-end protections that are necessary so that fair market value is reached in all circumstances, whether it's an auction or a post-auction short-term. Thank you. I appreciate it. Thank you. Justice Sotomayor? I think your fallback position, or your main position, is just compensation under the Constitution requires fair market value. Correct. If I disagree with that, and I believe just compensation should be defined the way Justice Scalia did in BDP, which is what's reasonable under the circumstances. And I believe that a fair, that a valid auction is a reasonable compensation. You lose on your main argument, correct? If you do not believe that fair market value is the standard, correct. And so if we believe that a valid auction, and by valid it has to be fair, it has to be permitted. I don't know about the personal property issue at all. I haven't looked into it. It hasn't been briefed. It's a very bad place for us to make such a huge decision. That would be up to the court below, correct? Correct. All right. Now, with respect to fairness, Justice Alito asked, are there, or said, are we going to have to wait for every court to decide what's fair? Or is there a standard of fairness that we can look to? Not a particular Michigan, but provide me with a case that talks about what a fair auction for a tax sale would be. We would point you to three cases, in fact. One would be Slater v. Maxwell, which provides that tax foreclosures have to be provided with entire fairness. And that's the trigger word from there. I'm not asking you for words. I'm asking you to point me to cases that set forth the parameters of what that fairness would look like. Slater is the high-water mark of tax foreclosure. We would point you, as a practical, multiple-factor aspect, we would point to Ballantyne and Grantham, this Court's prior decisions, which we have briefed. Okay. Thank you, counsel. Justice Kagan? Mr. Ellison, wouldn't your primary position effectively stop states from using foreclosure sales? Because I'm just thinking that if you accept the proposition, I guess I am going to ask you to accept the proposition, that foreclosure sales usually depress prices so that they're lower than the fair market value. If I have to give you the fair market value, you the homeowner, am I not going to lose money if I'm the state on every transaction like this? I mean, let's take an example. Suppose you don't have this mismatch that you have here between the very small debt and the — suppose you have a $100,000 debt, right? And a foreclosure sale is going to get you $110,000. And then the state takes the $100,000 that it's owed, and it gives you the $10,000 back, right? But then if you say, well, no, the fair market value was really $150,000, so I'm entitled to $50,000 back, right? Well, that's just going to cut into what the state gets to take, and it's going to mean that the state doesn't get the debt satisfied. So my response is that the Fifth Amendment requires just compensation, and what seems to be baked into some questions today has been whether this is best compensation. But assuming you're hypothetical where the — Well, I'm just saying that the state is never going to get satisfied in that situation where a foreclosure sale will lead to less than the fair market value. So the state is going to say, well, we can't use foreclosure sales anymore to satisfy debt obligations. I would agree they can't use this style of tax foreclosure sale. There are plenty of tax foreclosure sale systems in place that can reach just compensation or even the best compensation in the foreclosure circumstances. What you're saying is that there are plenty of foreclosure sale systems that can reach fair market value.   And I guess I think how could that possibly be? I mean, if you're selling a house on foreclosure in an auction, you're just not going to get the fair market value as if that house had never been foreclosed on and you were selling it in an open market. But acknowledging the assumption you want me to make, which is the fact that the foreclosure itself can depress the price, it can't depress the price, I think, this far. Now, that could be a factor. It could be a piece of evidence. And we can offer contrary evidence to say even in this foreclosure-type environment, the price that it was actually sold for was not good enough. And this is our graph and Valentine challenge that's there that says in this circumstance, the particular system that the government's created in this particular type of auction sale unreasonably and unfairly depresses the price, whether it's market appraisals, professional evidence, even the government's own assessments about what those values are can say what you got at the auction is not enough in that circumstance for that system. Justice Gorsuch? There's something incongruous about the fact that when your property is taken by the government to enhance it in a way that's going to increase its value radically, I take a house, I'm going to put a skyscraper on, I'm going to rezone it, the property owner doesn't get the upside. Correct. But here we're debating about how much of the downside they're going to get. Correct. And I would go as far as to say that this Court has always said the government does get the upside. It's a well-established takings law. The problem that I see here is that even if this is not a takings, if we take it out of the takings context and we put it in the excessive fines, what we have here is a government that says for a very small debt, we are going to take and destroy vast majorities of the equity that's valued at the time that we took title to the property itself. So even if the takings part of this doesn't provide the answer, the excessive fines in particular circumstances, which where the delta is so high here, can provide alternate relief. And then I do want to understand just a little bit better this principal residence exemption that led to this tax, this $2,200 or whatever it is. You won in front of an ALJ who said that the family doesn't have to pay this.  The county then went ahead and assessed it anyway and used that as the basis for this foreclosure. Correct. How did that happen? I don't think you have a long enough afternoon to explain the story of what happened with here. But the very short version of it is that the PRE credit was determined by, in Michigan we have a tax tribunal that's determined that. I've read the briefs. I got that. I'm just curious. Why would the county pursue a $2,200 debt that their own ALJ said wasn't owed to this extreme? We can't figure that answer out. We don't believe it's due. And the reality is, is by the time the tax assessor actually informed Mr. Pung that the price was actually, that she had put the PRE credit, had taken it away, denied it once again, the very limited 35-day window in which a Michigan taxpayer can activate the process of the tribunal to go back again. After it's already won. It's already won. And so we're in a weird circumstance here where the tax is legally, technically owed, but actually isn't owed in these circumstances. And it's a terrible position to be in for a homeowner who's trying to keep their home. Yeah, if you want to talk about what's just. I think it's important. We've been talking about the equities on the government side. I think the fact that tax isn't owed is a major equity on the property owner's side in this circumstance. Thank you. Mrs. Kavanaugh? On the possibility of remand for consideration of fair process, the Solicitor General says, as part of that, the courts below could consider whether and to what extent petitioners preserved the issue. If he has, he'll bear the burden of showing that the sale was not conducted fairly. Do you agree with that? We believe that's the first correct step that, at least one theory that can be challenged, but it's not the only theory that can be challenged on a remand. What are the other theories? The other theory is inadequacy of price combined to this as well. Because you could have a sales auction that is entirely fair, but still doesn't reach just compensation. But do you agree you would have to show that you preserved the issue and that you would bear the burden of showing that the sale was not conducted fairly? As someone who represents property owners, we always want to put the burden on the government whenever we can. That's why I'm asking the question. The court has not spoken to that answer yet. You don't necessarily agree. That's fine. I just wanted to clarify what you thought about that. And then secondly, Justice Sotomayor, a few times as broad, Justice Scalia's opinion in BFP, and that does speak, as you know, very generally and broadly at the end about foreclosure redefines the market, and given that altered reality, the only legitimate evidence of the property's value at the time it was sold was the foreclosure sale price itself. And I just want to hear your succinct response to BFP and how you distinguish not only the holding, but the reasoning and rationale of BFP. Of course, the first answer, of course, is always to point to footnote three in BFP and say in the constitution. Which is a standard footnote that we use. But the question is the rationale and why it wouldn't apply more generally. Two answers to that question. One is in the bankruptcy context, Congress has a given separate authority to reallocate the burdens of debt between private debtor and creditor in those circumstances. This is an Article I, Section 8 question. We're not here on Article I, Section 8. We're here with the government with the takings style claim. So we think that easily distinguishes in that aspect. Importantly, BFP on the facts itself, and I won't get into tremendous detail, but the foreclosure occurred pre-bankruptcy. In California, at the time that that foreclosure occurred, they had a challenge process that they could have challenged the unfairness of the foreclosure before it went into the bankruptcy process. And the property owner didn't opt to utilize that process, presumably thinking that the price got fair, and apparently their bankruptcy attorney thought differently once they got in there. So in addition to the just we're in different constitutional worlds, I think the facts that led up to the foreclosure and how the question was framed before this court got there in two totally different paths and are not congruous. Thank you. Justice Barrett? Counsel, I want to echo what Justice Gorsuch said. I mean, it seems like there was some real unfairness to your client. I mean, frankly, reading the briefs, it sounds to me like this tax assessor was like Inspector Javert, but it was even worse because Jean Valjean hadn't stolen the bread. I mean, you didn't even owe the tax. And it's this small tax and the big loss of the family home and of the money. So it does seem that there's some unfairness there. But I'm struggling to see how it fits into the takings framework. Can you tell me of a case that we have that treats the foreclosure of a house as a taking? I mean, Tyler treats the pocketing of the surplus as a taking, but I'm not aware of a case. I just don't know if it fits this framework. I'm not aware of a case of ours that says that when the government forecloses on the house as opposed to when it pockets the money, it's taking the house. The best I can point this court to is Tyler, and I think Tyler was specifically written with the words about value as opposed to surplus proceeds if we look at many of the passages in Tyler itself. What's important, I think, is that historically, under the common law, under debt collection schemes that are developed by states, there's always a back-end protection on the former property owner. There's a sales confirmation. There's a review process. But none of that answers whether it's a taking. Okay, well, let me ask you this question. You say that it should be fair market value. You also say that taking happens when the government forecloses on the property as opposed to when it sells the property at auction? In this circumstance, yes. Which is the right date for gauging the fair market value if there's a gap of a year? When they take title. When they assume full and complete title, that is a taking because the person is dispossessed of the ownership of that property at that point. So the property falls in value, and that's the government's risk. It is, but it's also the government's benefit if it goes up in value, as Justice Gorsuch points out as well. It's the time. This court has always said we measure precisely at the time of the take is what the value of that property is. Okay, so let's say I don't think Tyler settles the question whether the foreclosure is a taking. And I think Tyler leaves open and might treat just the pocketing of the surplus as the taking. Why couldn't I view the foreclosure of the house as just an exercise of the taxing power and not the taking? Because the government is taking more property than necessary to fulfill the debt. Because at that point, they're no longer a debt collector anymore. When they've taken that much property over the debt itself, they become a confiscatory government now as opposed to a debt collector. If a client doesn't pay my bill, I don't get to go seize their whole entire house. I can only collect on the piece of the debt that I'm entitled to do so. Government has different powers. They can act as a super debt collector, and they're utilizing their takings power to be able to take more property than necessary. And when you trigger that taking obligation, here, again, what's taking is not the surplus. It's the equity that's in the home at the time of the taking. That's what triggers the obligation to pay just compensation because the Fifth Amendment requires it. Justice Jackson? Can I just get clarity on the tax isn't owed scenario in this situation? I mean, ordinarily in the tax system, if you're contesting that you owe the taxes, you pay them, and then you go through some sort of process to get refunded by the government. So is that not the case here? I have to acknowledge this is a unique case in that the tax isn't owed. This is the worst of all examples of, I think, government run amok on this. The government says it's owed. That's why they're foreclosing on your house. So the dispute is, I guess, over whether it's owed, and the question is whether it can be collected before that dispute is resolved. And in other tax schemes, it can be. Correct. Right. So why can't it be here? Because Michigan has this very unique system. The PRE, as I was engaging with Justice Gorsuch, the PRE has this very narrow 35-day appellate window that when the assessor says, I'm taking away the PRE credit, you have 35 days, even if you know it or don't know it. If you don't trigger the tax tribunal's review in that, you're barred from challenging that tax from whether it's owed or not owed in that circumstance. And you couldn't bring some sort of, under Michigan law, a collateral attack on the fairness of that process. That is correct. Not then. And I have certainly tried as part of the federal case here to bring that detail in. But as the Sixth Circuit and the trial court both below said, we don't consider any of the factors outside of surplus as categorically fair market value. And they went no further than that in any further analysis. One final question with respect to Justice Alito's type analysis. I mean, I do understand the concept of we have a fairness problem because this is a really small debt and a lot of equity in the House. But to the extent that the homeowner has noticed that the government is intending to use this particular tool to recover its debt, I wonder if the fairness questions that you are raising don't get resolved. Because the notice gives the homeowner a chance to prevent that terrible outcome. I hear you if there's no notice, there's no opportunity, there's no chance for Mr. Pungent to run in and pay the $2,000 so the government doesn't steal from his perspective his family home. But when the government says clearly, this is how we intend to solve the problem of you not paying your taxes, why isn't it incumbent as a matter of justice for the taxpayer, if they want to avoid the thing the government is threatening, to just pay the taxes in some other way? I believe if Mr. Pung knew he was going to be at the United States Supreme Court arguing about $2,200, he would have paid that many years ago. But the answer to your question is, at the point when the government takes more property than necessary... I'm before that point. I'm before the taking. I'm at the government threatening to take your house. And when they do that, the question is what comes next as a matter of fairness and traditional tax policy, etc. And the reason why I keep getting hung up on your ultimate this is so unfair point is because I see a very clear opportunity for the taxpayer, who, by the way, is the original problem because he hasn't paid the tax, to solve the problem. And when the government just follows through with what it said it was going to do, because it owed this money in its view, I don't understand how the taxpayer gets to say it's unfair that the government didn't do all I think it should have done to get my house valued at the highest possible price. And in fact, if they put it in a tax auction, which is just standard, they've got to actually go and pay me the difference. That seems like real unfairness the other way, to the rest of the American people, that we are paying you because you didn't pay your taxes and the government had to foreclose on your house. The best answer I can give you is governments have a lot of tools in their tool chest to collect debts. They can use lawsuits. They can use the Peloton bike example I was using earlier. They have a lot of tools in their tool chest. If they're going to utilize a process that captures way more property value than what the tax debt is, the Takings Clause does not have a moral fault. The Takings Clause has balanced those interests already and has put that burden onto the government. Thank you. Thank you, Counsel. Thank you. Mr. Liu. Mr. Chief Justice, and may it please the Court. In Tyler, this Court looked to history and tradition to conclude that a taxpayer is entitled to just compensation when his home is sold for more than he owes. The same history establishes what compensation is just. As long as the sale is conducted fairly, just compensation is the surplus proceeds. According to Petitioner, compensation should instead reflect a property's fair market value. But as this Court recognized in BFP, foreclosed property is simply worth less. Petitioner's approach would defy that reality and spell the end of tax sales in this country. As for the Excessive Fines Clause, it's simply not implicated here. Any taking that's justly compensated for can't be a fine, can't be punishment, and can't be excessive. I welcome the Court's questions. Mr. Liu, you seem to put a lot of weight on the fairness of the process. How do we determine that? Do we look at history and tradition? Do we look at, as Petitioner argues, at least as a part of this, the end result, whether or not the price is a fair market value? What should be our gauge for that? I do think we look to history and tradition to determine what a fair sale looks like. I think some helpful guideposts are the Cooley Treatise, starting at page 334, that goes through the historical practices of jurisdictions at the time. I think the federal government's 1812 statute is also a helpful guidepost. And I think if you look at those guideposts, there are basically three minimum ingredients of a fair sale. One is public notice, notice that contains the time and date of the sale, a description of the property. The second is that there must be a public auction. It can't be a secret sale. It can't be a private sale. And the third ingredient is that the auction must be competitive. There must be an opportunity for bidding and sale to the highest bidder. And, of course, you can also look to history and tradition to also figure out what is the amount of the tax debt that can be subtracted from the sale proceeds to yield the surplus proceeds. But do I think the inadequacy of the price bears on that? I'm not going to dispute that a truly grossly inadequate price should cause a court to look more closely at the procedures, but the fact that the price is inadequate is not alone enough to justify setting aside the sale, and it never has been for the centuries that tax sales have been conducted. Has the taxing authority and power of government superseded that of the constitutional right to private property? No. If I'm hearing the question correctly, no. The government's authority to foreclose on property doesn't supersede any private property rights. I think what the Taking Clause reflects is a really important guarantee of what happens when the government does take property, and it's the guarantee of just compensation. That's the balance the founders struck. Are there more protections in mortgage foreclosures, for example, than there are in tax foreclosures? There may well be. To contrast some of the cases my friend cited, he cited Grefham and Ballantyne. Those were not tax sale cases, and they did mention this concept of gross inadequacy of price. If you look at the Court's on-point opinion on tax sales, which is Slater v. Maxwell, the Court rejects the notion that tax sales could be challenged based on a mere inadequacy of price. I'm not talking about that. It seems as though when we talk about such things as mortgage foreclosures, which we, of course, know are contractual, but there are all sorts of built-in protections for the homeowner. Are there similar built-in protections for the taxpayer in tax foreclosures? I think there are, but I don't think they're constitutionalized by the Takings Clause. I think federal and state statutes have long proven perfectly capable of protecting the process and exempting certain property from levy in the tax sale context, and so they've provided the protections that may exist outside. I think my point is rather that you're looking at a contract, a private contract, when you're looking at mortgage, and there are these built-in protections. You're looking at a constitutional right with respect to private property as it relates to government. It seems as though that if you're looking at protections, they should be at least similar. Yes, and I think it's a pretty good sign that the tax sale procedures are constitutional in that they provide the tax sales that are conducted by governments look very much like the private mortgage foreclosure sales that banks and private lenders conduct. You say that we should vacate and remand, correct? We can't affirm because none of these arguments about history were developed in the Sixth Circuit. They just went off on the idea of foreclosure sales automatically good enough, and you don't support that view. Correct. We think the right way to go is vacate and remand for consideration of any arguments that have been preserved. And it really would be any arguments about what history and tradition might require in your view that they should consider that are preserved. Exactly. So long as they're preserved, all of those arguments can be considered. So, for example, Cooley also says, don't take more property than you need to, right? That's another rule that a court might want to look at. That is certainly fair game on remand. And they say, if you can take the Peloton rather than the whole house, you should take the Peloton. If it's preserved, that could be considered too. All right, thank you. Do you have a position on whether those things are required? You're just saying if they're preserved, they can be litigated below. Do you think they are required? I don't think they're required by the takings clause to take the personal property hypo. There's no need for such a rule that says the government needs to exhaust the personal property. Well, if you want to play with history, if you want to invoke history, you can't cherry pick it, Mr. Lew. And, you know, the history there is pretty clear that, you know, you invoke Cooley, you've got to eat your Cooley. I read Cooley differently. Okay, all right, that's fair. But you would accept that you have to deal with the whole of the history. You don't get to cherry pick your history. Oh, of course. And that passage from Cooley is a rule about divisible property. What it says is when property is divisible, the government shouldn't take more of the parts than it needs to. Now, here the property was indivisible, and everyone agrees that it was necessary to take the whole property. You couldn't take just the backyard or just the front yard, and so that rule is simply inapplicable. Well, how about, Mr. Lew, a rule that would say there's the house, but there was also a car, and the car could have satisfied the $2,000 debt? We don't think the Takings Clause constitutionalizes that rule. We think the Takings Clause doesn't address the antecedent question of what property can be taken for public use. Rather, it addresses the subsequent question of if you take property for public use, what is the just compensation? But I just want to address the merits of this personal property exhaustion rule. There's no need for such a rule, because if the taxpayer wants to sell his Peloton bike to satisfy his tax debt, he is free to do so any day of the week. In fact, our foreclosing on it would make it more difficult for him to sell it. So if, indeed, Mr. Pong thinks the way to satisfy my tax debt is to sell my Peloton bike, there's no need for a rule that forces him to do that. Well, what if the only thing he has to sell is his house? If the only thing that he has to sell is his house... He doesn't have to do that, does he? Well, he can sell his house, and he's free to do so to pay the price, if it's a situation where there's a financial hardship or it's a... Well, what do you mean if there's a financial hardship? Well, in Michigan... It's usually not a defense to paying your taxes. No, but in Michigan and in many other jurisdictions, taxpayers who truly are unable to afford their taxes are given installment plans, offers in compromise. They're given opportunities to... I'm sorry. Go ahead. They're just given opportunities to find a way to pay their taxes. And one of them is indeed to ask, in the case of the IRS, to discharge the house from the federal lien so that the taxpayer can sell it. And what happens at closing in that open market sale is they simply cut a check to the IRS. Well, what if the validity of the tax assessment is still under challenge? So if it's still under challenge, under the IRS rules, we cannot levy on the house. So that challenge can go forward. I think what's unusual about this case is that instead of paying the tax and then challenging it, Mr. Pung just wanted to litigate all the way through without paying the tax at all. Thank you. Justice Thomas? Justice Alito? There are some suggestions in the many briefs that have been filed in this case, although not in Petitioner's brief, about specific things that could be done to make the process fairer. For example, one of the briefs points to statutes that have been enacted in Oregon, Maine, and Massachusetts. And they say that under those statutes, the jurisdiction that is attempting to collect the taxes must first list the property for sale at market value via real estate brokers or real estate agents. And then if the realtor listing is unable to proceed and a public auction is allowed where the minimum strike price at auction is two-thirds of the fair market value, et cetera, et cetera. So some of those things seem like possibly good reforms that would make the process fairer. But what concerns me is getting into the determination of which the details of this scheme that are minimally necessary to comply with the takings clause. We share that concern as well, Justice Alito. And that's why at the outset, in response to Justice Thomas' questions, I provided a few things that we think provide the constitutional floor. But above that floor, I think states have leeway to adopt other procedures that, in their view, may or may not close the gap between the forced sale price and the fair market value. But it's up to them to adopt those. Justice Sotomayor? That's the problem, Mr. Lew. Because you get into a situation like this one that Justice Barrett very eloquently described as feeling like fundamentally unfair. They're fighting over a $2,400 tax debt that at least two courts said wasn't owed, and yet they plowed ahead and got a price half the amount of the value of the property that was split for the value of the property. At some point, doesn't the Constitution have something to say under the rubric of what a just compensation is? I mean, is it just to give the state that much leeway? Shouldn't the minimum require a little bit more? I don't think the takings clause speaks to those issues. I mean, to the extent that the... So what would? Well, I think these sorts of issues about when a foreclosure is appropriate have typically been the province of federal and state statutes, and those statutes have proven perfectly competent in addressing those issues for centuries.  Not here. That's the claim. Well, I think what the facts of this case show is that Mr. Pong was given notice of the delinquency. I mean, he face-to-face was told by the township assessor that he owed the tax. And he went to tax court, and the tax court said, No, you don't. And he presented the government with that notice, and the government said, Bye. Right. And I think this is an unusual feature of this case, that while Mr. Pong did appeal the denial of the principal residence exemption as to certain years, he didn't appeal that denial as to the year at issue here. I don't know what explains that choice, but it is what... All right, I have one final question. Given the three minimums of fairness, are you saying those are the only ones, or are you leaving open the door that there are potentially others? We are leaving open the door that there are others. I think, as has been mentioned this morning, this is not an issue that has been the focus of the briefing. So one of the reasons we think a remand is appropriate is for any preserved issues like this to be addressed. The reason why I say it's not an exhaustive list is because, while there are certain procedures that you can point to that will provide fair procedures, there's any number of things a state could put on top that would actually undercut those same procedures. So I don't think it's as simple as going through and saying there's X, Y, and Z. I think you need a catch-all that's something like, and the state can't do anything else to kind of undercut all the procedures on that list. So the other side is saying you can't do anything that undercuts fair market value. That's how they would answer that question. And so how should we answer it? It's not that way. Right. And I don't think the mere fact that a procedure is or is not going to have an effect on fair market value can be enough to decide whether it's okay or not. Or should it be effective? Whether the procedure undercuts fair market value? In some not rational way. I think the guide has to be history and tradition. I think that that provides the most principled way to decide which procedures are required and which are not. Thank you. Justice Kagan? Just as an empirical matter, Mr. Liu, do you think that Justice Scalia was right when he said the thing that Justice Kavanaugh read, that foreclosure sales just produce not as much money as the fair market value would? Yes. We think it's just a matter of basic economics. It's been proven true through centuries of experience with tax foreclosure sales. And Petitioner indeed acknowledges on page 20 of his brief that forced sales inherently lead to lower prices. So what would it mean if we said that the measure was fair market value with respect to foreclosure sales? It would spell the end of tax sales in America. Every tax sale is necessarily going to yield less than fair market value. If the government is nevertheless required to reimburse the taxpayer as if the sale yielded fair market value, then every tax sale is going to end up costing the government money. And it won't be long before governments simply stop conducting tax sales altogether. And at the end of the day, who does this hurt? It hurts other taxpayers who are actually paying their taxes because the shortfall has to come from real taxpayers. Thank you. Justice Gorsuch? In that analysis, I'm sure there's a lot of careful economic work done that probably quantifies the delta between fair market value and what a good auction price after foreclosure looks like. Would that be relevant consideration in this process that would happen on remand, the evidence about what, in fact, a good process tends to yield? I think that sort of analysis can be an indicator. It can be a reason to look more closely at the process. After all, I think the historical guarantees of notice and publicity and competition are there to make sure. When you don't have those, what happens is that the price goes down. So conversely, if you see a very, very, very low price, about basically a third of the market value was realized, would that be a good reason for a judge to be pretty skeptical that the procedures were fair? I think pretty skeptical is too strong. I think it is reason to look at the procedures and to scrutinize. I suspect it's a great deal lower. I don't know. I haven't done it. Maybe you have, and you can tell me. But I suspect one-third or approximately is a good deal lower than a fair process tends to yield compared to fair market value. It's hard to generalize because in response to Justice Alito's question, I do think it's true that states have some leeway in the types of procedures they adopt. So there's going to be state variation. Sure. A lot of people may just let the whole thing go to seed, not take care of it, not keep it up and realize as little as possible, not notify anybody about it. Others might actually care and take care. I can tell you the IRS estimates a forced sale like this to result in 60 percent of what the quote-unquote fair market value would otherwise be.  That's very helpful. Thank you. Justice Kavanaugh. Do you think our opinion in this case should talk about the procedures at all or any of this? No. I think it's enough for this Court in this case to simply articulate the correct principle, which is as long as the sale is fairly conducted, the surplus proceeds represent just compensation, and fleshing out what a fair sale looks like can be left for remand or for another case if the issue isn't preserved in this one. So we shouldn't even say the guideposts that you mentioned in response to Justice Thomas? We're not urging you to do so. We acknowledge that the precise guideposts have not been the subject of adversarial briefing. That's not that I don't believe that they are the correct guideposts, but there just hasn't been— I think is your point. Yeah, there just hasn't been the airing of what those procedures are that I think would warrant this Court getting that granular about what the Constitution requires. Thank you. Mr. Liu, I just want to ask you about the right analytical framework as we think about the opinion. This is an unusual case, and as I was kind of going back and forth with your friend, we don't have a case saying that the Takings Clause applies in this context, and I don't think Tyler quite does say that the foreclosure itself is the taking. You've briefed it as if it is a Takings Clause issue as opposed to an exercise of the taxing power. Why did you make that choice, and conceptually, when does the taking happen? So we don't think every foreclosure is necessarily a taking. We think it's going to depend on whether there is excess value in the equity of the home that exceeds the tax debt. But as to when the taking occurs, if there is excess value above the tax debt, we do think the taking occurs at the time the house is foreclosed upon, not at the time of sale, which could be a different time period. But you might not know if there's extra value in the house, because if the government is saying, so long as the sale is fairly – I mean, here, there was a huge difference between the debt and the value of the house. Let's say it's a lot closer. Let's say the debt was $90,000, and you don't know how much the house is going to get at auction. So then did you take the house at foreclosure? It's true. Without doing this sort of sale analysis, you might not know. But that's also true, and even to a larger extent, under a petitioner's test, because their test is hypothesizing a fair market sale, and then reasoning from that that there is excess value. All I'm saying is what you would hypothesize at that moment is just a different kind of sale. You'd hypothesize a distressed property sale, and if your hypothesis is that that would result in more than the tax debt, then I think you have a good indication that there is a taking at that moment. Now, of course, the actual sale that happens is going to confirm exactly what the surplus proceeds are, but I don't think there's any real analytical problem in thinking that the taking occurs at the time of foreclosure. But I should also add that timing is going to be dependent on the laws of the jurisdiction. So here in Michigan, the judgment of foreclosure is a gap. There was a gap, and then the sale happened. Under the federal scheme, the taxpayer's right of redemption goes beyond the sale. The taxpayer has until 180 days after the sale to say that he wants to redeem the property and take it back. We would say under the federal scheme, there's no transfer of title and therefore no taking until that right of redemption expires. And that's traditionally how I think courts have understood the property rights here. The transfer of title coincides with the expiration of the right of redemption. So the right of redemption is where the expiration of the right of redemption, it's not quite, I mean, let's see. I'm not an expert in foreclosure by any stretch, so I don't know how all these steps work. But if I'm understanding you correctly, it's not really at the moment of foreclosure because the right of redemption might expire at a time later than that. Exactly, exactly. And technically under Michigan law, I think there's still, you have until the following March 31st or 21 days after a contested foreclosure. So you're not really pegging it to when the government exerts control over the property. You're pegging it to when the property owner has lost any ability himself to control the property.  Okay, well then that would be different. When we started talking about foreclosure, you are saying analytically I should be thinking of this differently. You're right. I was using foreclosure as a sort of shorthand for the transfer of title. But you're right, as a technical matter, the judgment of foreclosure doesn't necessarily coincide with that transfer of title. But I think it's the transfer of title that is key. And that may vary depending on the jurisdiction. Okay, that's helpful. Thank you. Justice Jackson? Really quickly, do you have any reaction to the thought that all of the fairness questions that are coming up in this case could actually be taken care of in the due process realm? So what I mean is that we have the fairness questions about whether the government should have taken personal property, Michigan government, personal property before the House. That's one set of issues. Whether the Michigan government conducted a fair auction. You all are accounting for that in the context of the just compensation evaluation. But I suppose you could say just compensation is the amount that is generated at auction minus the tax bill, which is what we're calling the excess proceeds. To the extent that your argument is that they didn't do enough with respect to the auction, what you're really complaining about is what Michigan law says about the process. And we have a whole set of cases and ways to evaluate whether, as a constitutional matter, the government is giving you adequate process. So it takes care, I think, of some of the concerns about, well, how do we do this, and figuring out whether it's fair or not. We have a rubric when we look at federal and state laws and they're giving process to people in a context. We say, as a constitutional matter, is this procedure comporting with due process? So what is your reaction to treating it like that? In which case we would affirm, because the Sixth Circuit is doing the taking part of this, just compensation equals excess proceeds, and leave open the idea that there could be another lawsuit by this very plaintiff claiming a due process problem. I don't think we have any real objection to putting the fairness of the sale under the heading of procedural due process. Yes. I think what matters most to us is getting the contours of that rule right. And I think whether it's viewed as procedural due process or a function of the just compensation clause, it's still going to look at the same legal materials. It's still going to look to the nation's history and tradition. Sure, absolutely. But it just helps that we already have a way of thinking about whether state laws are giving people adequate process. It seems like, you know, to kind of import that here seems to be difficult. And that's what a lot of people are reacting to. Well, I guess all I would say is there's, I think, a common sense intuition that if a sale is rigged or there's collusion in the sale, that what results from that sale isn't really just compensation. Sure, but the state law is doing that. And we can evaluate whether the state law's process is generating artificially unfair depressed auction prices under the rubric of are they giving you adequate process. That's right. And the only thing I would really push back on, though, is the idea that some of these other rules about the government's authority to foreclose and what it can foreclose on, I don't think there's a home for those rules under the rubric of I think it would have to be substantive due process. Fine. Thank you. Thank you, Counsel. Mr. Nelson. Mr. Chief Justice, and may it please the Court, The Petitioner's Takings Clause question here has morphed from just whether fair market value is the only measure of just compensation into questions regarding whether the Takings Clause requires the government to execute against certain property before others when collecting a debt and whether the Takings Clause dictates the procedures for government auctions of foreclosed property. Only the first of these questions was actually preserved and addressed below and challenged in the District Court. The Sixth Circuit here correctly applied historic practice, this Court's precedents, and economic reality to determine that surplus proceeds from an auction sale, less the tax debt that's owed, establishes just compensation. Property sold in a compelled market under compelled market conditions is worth what the market pays for it under those conditions and not what the property would be worth in an idealized private sale. By contrast, Petitioner's fair market value theory has no foothold in historic practice, this Court's precedents, or economic reality. Even though the government has been selling properties at auction and returning the overplus for centuries, not a single case has ever suggested that the surplus proceeds are equal to the property's fair market value, less the debt. Moreover, the Petitioner's fair market value approach assumes market conditions that simply don't exist after a foreclosure because the property owner's decision is not to pay the tax, not to sell the property, not to obtain a statutory deferral, and not to exercise the right of redemption. The Takings Clause does not require compensation to the owner for owner-created reductions to the property value. That would be unjust to the government and to the public. I welcome the Court's questions. What was the assessed value on which the tax was imposed? The assessed value here was approximately $194,000. Can Petitioner use that as a basis for its disagreement with the foreclosed sale value? Justice Thomas, we do not believe so because if the measure of the property's value is at the time of the taking, it's either if the taking is the surplus proceeds, then the amount of the surplus proceeds is what's taken. If the property value is the equitable interest in the property at the time that the right of redemption expired, the property was no longer worth the assessed value under market conditions because the property was in foreclosure and the right of redemption had not been exercised, such that the value of the equitable interest in the property had diminished to a forced sale value, which we believe is the teaching from BFP. So the value decreased approximately $120,000 in that short period? We believe that the property, yes, the property decreased in value by a very significant amount between the time of the assessment and the time of the expiration of the right of redemption because of the nonpayment of the tax. No reasonable buyer out in the market would acquire the property at the moment of the taking here for the $194,000. Except for someone did shortly after the auction buy the property for the prior $194,000. Doesn't that give rise to some reason to be concerned about the procedures that your client used? No, Your Honor. The procedures here have been the historic process that have been used since the beginning of the Republic, but with regard to the particular $195,000 subsequent sale price, what we have is right now a discussion of the assessed value of the property on the open market and a later sale of the property more than a year after the property was purchased from auction, also on the open market, and not a sale within the confines of a forced sale with regard to the property. At the time of the foreclosure, there was no longer an open market for the property. There was not an unlimited time to purchase the property, and there was not the opportunity for there just to be a willing seller. I am curious. I know this is a bit of a sideshow, for which I apologize, but I am curious about how come the assessor charged that tax again in disregard of the ALJ's, at least oral indications, that it was not owed? And how come nobody over the many years between there and here said, hey, wait a minute, what are we doing over a $2,000 tax bill? So, Justice Gorsuch, there are a couple of wrinkles that occurred in this process. Number one, the decision with regard to the personal residence exemption was made by the township assessor, not the county. So the township assessor disallows the personal residence exemption. The property tax remains unpaid. The property tax is delinquent. So the property gets turned over to the county treasurer for the collection of the tax. I understand that there are a lot of bureaucracies involved and that the right hand is not always talking to the left hand. I appreciate that. We've all encountered that phenomenon. But what is curious to me is we're sitting in the Supreme Court of the United States many years, no one, I mean, at some point the right hand recognizes, ah, there's a left hand over here. And at some point, a lawyer gets involved and advises the left hand or the right hand, and I'm not criticizing anyone, don't get me wrong, I'm just curious how a $2,000, erroneously applied, it seems, $2,000 tax bill, led to taking someone's home, a sale for a third of what it's worth, and then very promptly the whole value is secured again by the person who collected it out of bankruptcy, out of the foreclosures. It's a striking set of facts. How did it happen? So the township assessor, I don't know what the township assessor's reasoning was. It may well be there's two requirements with regard to the principal residence exemption. There must both be, the person who is entitled to it must both be the owner of the property and be using the property as their principal residence. There may have been a question with regard to whether it was being used as a principal residence at the time. That is not in the record. With regard to after the property is turned over now to the county, who is the respondent here, when it's turned over to the county, the county has no authority to say, now this tax should not have been paid, unless what happens is the... Oh, goodness. Really? Unless... Nobody can say, hey, there was a mistake. I have to foreclose on someone's home for a tax bill I now know is false, but I'm forced to do it. So, Your Honor, the petitioner here had the opportunity to come to the show cause hearing or the foreclosure hearing in the show cause hearing with the treasurer or the foreclosure hearing with the court and say, this tax was never properly assessed. At that time, there is an opportunity to say the tax is not properly assessed, we're going to go ahead and reverse this whole process and we're in the clear. But that didn't happen. Is this always how the county does it? I mean, if the tax bill were $100, you would still take a house? Typically, if the property tax bill is $100, that means the assessed value of the property is very small. So, yes, there are instances where there are very small tax bills with properties that also have lower assessed values. I find it strange here that every other tax year was paid. Don't you think by the time of the sale that the county would have said, wait a minute, every other tax bill has been paid, something went awry here? I think they were well aware of what went awry, that there was something that had gone awry in the situation. And this particular issue that had gone awry is the tax bill that had not been challenged, had not been paid. I do have a question. Mr. Liu's answer raised it in my mind. It's one thing to say that an auction price reflects the just compensation when it's close to or at the time of the taking. But once you separate out the point of just compensation, which is when you've taken it, which you seem to agree, to the time you took title, and let's assume Mr. Liu's answer, and redemption rights have expired, what permits you to hold onto that property until it secures the lowest value? Meaning, I can assume that just compensation is just as an auction price if the auction is close to the taking. But if it's not, how do I make that leap? So, two responses to your question, Justice Sotomayor. First, with regard to the timing here. The timing here was somewhat unusual because the actual foreclosure was challenged, and so there was multi-year litigation all the way through the Michigan Supreme Court with regard to the underlying foreclosure. I will quote that the foreclosure, the taking is when that finishes. So when the foreclosure judgment was reinstated, there was a period of time for redemption, and there was not enough time to notice the property for the next regularly scheduled auction for these properties. So the counties hold two auctions for these properties, one in July or August, and then one typically in September or October. That is the normal process. Do you know what the historical practice was on this issue? Was the historical practice more that what happens in federal lien law, or is this a new creation by states that they foreclose, keep the property as long as they want, and sell it when they want to? No, Your Honor. I don't believe there's anything that I've seen with regard to specifically how long after the foreclosure occurs that the auction sale must happen. That's one of the things that hasn't been briefed, but it is an important question in my own mind. All right. Thank you, sir. Well, Mr. Lew seemed to suggest that, and maybe I misunderstood him, but that if the taking occurred when the right of redemption expired, that that would be the relevant moment for valuing the property, because that's how the Fifth Amendment works, and, you know, as applied to the states too, that when the property is taken, that's when we value it. So kind of picking up on what Justice Sotomayor is saying, I had understood Mr. Lew's answer to be consistent because he was saying, well, you would kind of make that judgment about what it would get at auction at the time the right of redemption expired. But I understood you to be telling Justice Sotomayor something different, which is don't worry about that date. We still treat it as being worth whatever the auction yielded, even if it's a year later. Justice Barrett, no, I'm sorry if I created some confusion. If the taking is at the time the right of redemption expires, and that's not true as a matter of Michigan law, so I want to come back to that. But with regard to if that's what the taking is, then yes, the valuation is as of that date, and the auction is, as BFP suggested, the best evidence of that. If there is a significant delay, that might be something that would call into question whether the surplus proceeds are generated or the accurate reflection. Here there's a reason for the delay. But going back to some of the questions you were asking earlier, Brother Counsel, under Michigan law, under the Raffaelli decision, the taking is deemed not to have occurred until the surplus proceeds are generated. And so as you were indicating earlier, there's an exercise. I mean, when a taking happens is a question of federal law. When a taking happens as a matter of federal law, the definition of the property interest is typically a question of state law, and as long as they're not defining away a preexisting property interest, my reading of this Court's jurisprudence is that state law would then govern. Here the Michigan Supreme Court has said it is the right to the overplus when the overplus is generated that is the relevant time to assess the taking. I see that as an argument about measure, but I don't see how that's an argument about what the taking is for purposes of federal law. I would have thought that when I lose all the bundle of sticks in my property and the state takes them, that's a taking for the purposes of the U.S. Constitution, whatever Michigan might say. And that is consistent with the Sixth Circuit's decision in Hall. There would be the equitable interest in the property as distressed by the fact that the property is in foreclosure and the right of redemption is not an asset. Once title is passed, I mean, would you agree that once title passes to the county, to the state, that that is the date of the taking for purposes of the federal Constitution? Because I'm betwixt and between the state law and the federal law, we don't take a position as to which is specific, but the result of them, we believe, is the same. I understand that you take all roads lead to Rome and we win. I appreciate that, but for our purposes, if we're considering a remand, that's another issue that I guess you don't have a position on, so it would have to be explored. Well, the Sixth Circuit has operated under the view after Hall that the interest that's being taken is the equitable interest in the property, the value, the distressed value of the property less the unpaid taxes. And that might be wrong, though, is what we're exploring here. It might be that the taking is the taking of the house in foreclosure. When fee simple passes from taxpayer to sovereign. So, no, Your Honor, we disagree with that because the payment of the tax itself is not a taking. So if the value of the property at the time... Hold on. I understand that, but you're resisting, or I thought you weren't taking a position. I guess I'm wondering which it is. But isn't there at least a colorable argument that a taking occurs when you take title to my house? Yes, Your Honor, there's a colorable argument. All right. Thank you. Then we don't need to go further, I don't think. But can I just ask you to follow up on that? Isn't the relevance of determining whether a taking has occurred just to get us to the point of determining what is owed to the taxpayer? In other words, it's not like a free-floating question of... You don't dispute that a taking happened here in the sense that, right? No, after Tyler, it would be foolish for me to... Okay, so you don't dispute that there's a taking. So to me, it's not so much when that taking occurred, except insofar as we think that when it occurred relates to when it should have been valued or what its value is. So the bottom line of all of it is what is actually the value of the taking that occurred? And so, I mean, I suppose you could say we reach all the way back to the point at which, you know, they first noticed him that he had his house foreclosed, or when the title passed, or all of those pieces. But there's also the argument, which is what the Sixth Circuit determined, that it is at the point in which the government sells the property, recovers its tax amount, and gives the person back the excess. Not so much the taking, but that's the value of what has occurred as a result of the taking. That is the just compensation that is owed to the person in light of this taking that everybody agrees happened. Yes, Your Honor. We agree. Mr. Nelson, did you have a back half of your answer to Justice Gorsuch's question? He asked whether there was a taking when the foreclosure occurred, and you said there is a colorable argument. Is there a but to that? There's a colorable argument. So the question was, I believe, there's a colorable argument that there's a taking when title passes. The but, I would add, is the question is, title passes, what portion of the bundle of sticks is actually being taken? Because if the property is worth, for example, the same as or less than the tax that's owed, and the property is foreclosed upon, the property is received in payment of the tax, and there is no taking at all. So the interest that's being taken, if at the time of the right of redemption expires, would be the equitable interest. And I don't believe that there's actually a difference between the respondents and the petitioner on that point. It's not the entire home. And when you said the taking, whatever it is, occurs when the title passes, which is, I think, the same thing that Mr. Liu said, that might be different than when the foreclosure occurs. Is that correct? The title will not fully pass until the right of redemption expires. So the right of redemption here expired 21 days after the foreclosure judgment was reinstated. Typically, that occurs under Michigan law on March 31st of each tax year. Thank you. With regard to some of the discussion with regard to the issues, there was a question with regard to safety valves that Mr. Liu indicated. For the Court's purposes, I would point the Court to sections, Michigan compiled laws section 211.78h, 78k, and 78q, for the purposes of identifying how Michigan law, like the law of most states, provides for ways for property owners to avoid foreclosure where they are unable to pay or there are issues with regard to disability that would prevent them from paying. With regard to the question, there was a statement with regard to the federal government about what the IRS anticipates receiving from a forced sale. The IRS typically only forecloses on properties that they believe will sell. The states, when they are foreclosing on properties where taxes are delinquent, there is no such selective process. They simply foreclose on all of those properties. Some of them are unbuildable lots. Some of them suffer from environmental contamination. Some of them are blighted. And they do not have an anticipation of sale. So typically, we would anticipate that auction sales of tax-for-closed properties would be at a lower rate than IRS foreclosures. Thank you, Counsel. Justice Thomas? When you said earlier that your process is similar to a historic process, what do you mean by that? I mean that historically the states have used the foreclosure process followed by an auction to recover unpaid and delinquent property taxes. Some of those, and there are a variety of intermediate processes that states have adopted that are in the historic record. We do believe that the Cooley Treatise sets forth a fairly wide range of what those practices are. But the overall foreclosure, auction, sale, and return of the surplus proceeds process that this Court identified in Tyler is consistent with what Michigan is now doing and the effect of what has happened in this case. Justice Alito? Justice Sotomayor? You said that the foreclosure judgment expired on March 31, 2018. The auction took place a year and a half, a year and a quarter later, July 16, 2019? So the foreclosure judgment was reinstated on June 12, 2018. The period of redemption expired on July 3 of 2018. And because there was not an opportunity to get the property into the notice package with regard to the next auction, the county waited a year. So how do I deal with the fiction that the auction price could be just compensation for a taking that occurred a year earlier? The market could have crashed. Anything could have happened. How do I deal with that fiction? So inevitably there's going to be some lag between a foreclosure and an auction. And Justice— No, not inevitably. The federal government and I don't know what the historical practice was. I suspect it was the title passed when the auction or redemption was after. I mean, there are a lot of things at the founding. I don't know what they are. To avoid that. There are ways to avoid it. If there is a specific concern with regard to events that occurred between the time of the taking and the auction, those would be a basis for challenging whether the auction reflects or establishes just compensation. Those challenges were not raised here. There was no challenge to the adequacy of the surplus proceeds based on the time between when the foreclosure judgment was reinstated and the right of redemption expired and when the auction occurred here. Okay. Thank you, counsel. Justice King? Justice Gorsuch? Justice Barrett? Justice Jackson? Thank you, counsel. Thank you. Rebuttal, Mr. Ellison? We welcome our brother's concession here that there has been a taking in this case which is contrary to their position, of course, in the trial court below. We welcome that concession. And we think it narrows the scope of this case because now we're only talking about valuation at this point. I would point this court to Virginia Electric and Kirby Forest that says that when there is a process that is being undertaken for takings, the depreciation of value caused by the taking itself or in Kirby Forest the prospective taking that's about to occur, that obligation, that loss is borne by the government, not by the former property owner. And I would point this court to those cases. I would also have to disagree with my brother, counsel, that there was a redemption right below. There was an attempt to redeem and it was denied. I think that's somewhat a side issue on this part, but the reality is that the government was not going to give back this property despite all the efforts of the Pung family. And it's been a frustrating – I've been the trial attorney since the very beginning on this. It has been a frustrating, awful case to try to tell someone they're going to lose their family home, and there's nothing you can do to get the government to stop them from doing that. So I know that's kind of beyond the scope today slightly as to the issue of the taking valuation that we've narrowed this case down to, but the Pung family is here today and they are devastated by the loss of this family home. And what they want is the justice that hopefully the Just Compensation Clause should provide for us in these circumstances. I would finally just like to finally just say is that the arguments of Brother Counsel was surplus proceeds is the end-all, be-all, and I think at least I take from the questions today that that can't possibly be the rule in these circumstances. But what he's not engaging on, and I believe Justice Gorsuch, you've referenced it with Mr. Liu, is you've got to take the bitter with the sweet. If you're going to take the benefits of tax foreclosure and you're going to take more property than necessary, you've got to also take the historical practices of the limitations on there, and if you're going to act in furtherance or beyond those historical limitations, whether it's taking the Peloton bike or eliminating yourself or all the limits that are traditionally there for normal debt collection practices, you also have to take all of those as well historically to benefit from that. And if you're not going to take those, you're no longer a debt collector, you're now a confiscatory government, and you're responsible under the Takings Clause. Thank you very much. Thank you, Counsel. The case is submitted.